UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555-jmp

Adversary Case No. 1-09-01120-jmp

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

KAIN KIN WON, et al.,

                  Plaintiffs,

      -against-

HSBC USA, INC., et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - -x

          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          October 28, 2009

          2:16 PM


B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1    HEARING re Motion Filed by HSBC USA, Inc. to Dismiss the Class

2    Action Complaint, Abstain or Stay the Adversary Proceeding.

3

4    HEARING re Motion Filed by Lehman Brothers Special Financings

5    Inc. to Dismiss the Complaint.

6

7    HEARING re Motion Filed by HSBC Bank (Cayman) Limited, et al.,

8    to Dismiss, Abstain or Stay the Adversary Proceeding.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Pnina Eilberg

25

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Lehman Brothers

5        1300 Eye Street N.W.

6        Suite 900

7        Washington, DC 20005

8

9    BY:   RALPH I. MILLER, ESQ.

10

11

12   WEIL, GOTSHAL & MANGES LLP

13       Attorneys for Lehman Brothers

14       767 Fifth Avenue

15       New York, NY 10153

16

17   BY:   RICHARD W. SLACK, ESQ.

18

19

20

21

22

23

24

25

1

2   CAHILL GORDON & REINDEL LLP

3        Attorneys for Defendants other than Lehman Brothers and

4          Bank of New York

5        80 Pine Street

6        New York, NY 10005

7

8   BY:   HOWARD G. (PETER) SLOANE, ESQ.

9

10  COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP

11       Attorneys for Plaintiffs

12       100 Pine Street

13       26th Floor

14       San Francisco, CA 94111

15

16  BY:   JASON C. DAVIS, ESQ.

17        LUKE O. BROOKS, ESQ.

18

19

20

21

22

23

24

25

GENOVESE JOBLOVE & BATTISTA

     Attorneys for Plaintiff - Wong

     200 East Broward Boulevard

     Suite 1110

     Fort Lauderdale, FL 33301


BY:  ROBERT F. ELGIDELY, ESQ.

1          P R O C E E D I N G S

2          THE COURT:  Be seated, please.   Good afternoon.

3          MR. SLACK:  Good afternoon, Your Honor.  Richard Slack

4     from Weil Gotshal on behalf of the debtors.

5          This afternoon we have on the agenda the motion to

6     dismiss the Wong adversary proceeding that was filed by LBSF.

7     There's also motions to dismiss filed by the other defendants,

8     including HSBC, who are separately represented.

9          Your Honor, before getting to the motions to dismiss

10    there are two items I wanted to bring to the Court's attention

11    as a matter of update.  The first, Your Honor, and you may know

12    this already, is that at the same time that Your Honor was

13    holding the last omnibus hearing on adversary proceedings the

14    parties here were arguing a motion to withdraw the reference in

15    front of Judge Swain.  Argument took place, the Judge dictated

16    a decision on the record and asked us, at the conclusion of the

17    hearing, to provide a copy of the transcript to Your Honor,

18    which we did on Friday, October 16th.

19          THE COURT:  I received that and I read it.

20          MR. SLACK:  The second item, Your Honor, before

21    turning to the motion to dismiss is that the Court may wish to

22    know that there have been settlement negotiations, not between

23    the parties here, Your Honor, but between the regulatory

24    authorities in Hong Kong and the banks that issue the

25    minibonds, which is not HSBC but the local banks that issued

1    the minibonds.  And under this negotiated settlement the

2    issuing banks have agreed to buy back the minibonds from the

3    noteholders at either sixty percent or seventy percent,

4    depending on certain circumstances.  And the minibond holders

5    agreed, to quote, "Withdrawn, permanently discontinue any

6    ongoing legal proceedings or mediation arising from or in

7    connection with the minibonds."

8            The settlement, Your Honor, is an opt in settlement.

9    So no minibond holder who did not affirmatively choose to

10   accept it would be a part of it.  And settlement packets were

11   sent out, as I understand it, the week of August 7 through 13

12   and the minibond holders had sixty days to respond.

13           According to the Hong Kong Monetary Authority press

14   release from October 23rd, there were approximately 25,000

15   noteholders who were eligible to receive, and that's a number,

16   essentially, of the class here who were eligible to receive the

17   offer.  Of that 25,000 approximately 24,300 responded to the

18   offer.  And of the ones that responded, of the 24,300, 99.1

19   percent of the minibond holders agreed to the settlement.  That

20   means that with respect to the 25,000 potential class members

21   here, approximately ninety-seven percent have agreed to turn

22   over their minibonds to these issuing banks and have foregone

23   litigation on their minibond holdings.

24           One point, Your Honor, that I would make is that we

25   don't know, we haven't been informed by the plaintiffs, whether

1    the name plaintiffs in this case have responded to that offer

2    or whether the name plaintiffs have agreed to that offer or

3    have just not responded.  The 99.1 percent, as I understand it

4    Your Honor, is an interim number in that there are still some

5    days for some people to be counted.  So that number could

6    actually grow.

7         The last point, Your Honor, is that my understanding

8    of the people who accepted it, ninety-nine percent of those

9    have already received their money.  So that the settlement has

10   been effectuated with respect to ninety-nine percent.

11        So what I would like to do, Your Honor, again just for

12   informational purposes, I have the Hong Kong Monetary Authority

13   press release that I would like to hand up to Your Honor, if

14   that's okay?

15        THE COURT:  That's fine.

16   (Pause)

17        THE COURT:  Thank you.

18        MR. SLACK:  And Your Honor, with your permission I'll

19   move on to the motion to dismiss.

20        THE COURT:  I'll give you the permission but let me

21   just ask you a question.

22        MR. SLACK:  Okay.

23        THE COURT:  What impact, if any, does the press

24   release, but more importantly the fact of settlements in Hong

25   Kong with minibond holders representing a significant percent

1    of the class, have on the present motion to dismiss?  Is it

2    just for my information or is it something that as moving party

3    you believe I should be taking into consideration in respect of

4    the matters before me?

5         MR. SLACK:  Two things, Your Honor.  One, that press

6    release is not necessary for Your Honor and the arguments I'm

7    going to be presenting in your ruling today.  So it's not a

8    necessary part of Your Honor's decision in our view.

9         It does have an impact, potentially, on two issues

10   that Your Honor may decide to reach.  The first, Your Honor, is

11   whether it makes sense to allow the plaintiffs here to replead,

12   as I'll get to it.  We don't think that's appropriate.  If Your

13   Honor was considering whether to allow the plaintiffs to

14   replead this as a derivative action, then a consideration is

15   under Rule 23.1 the plaintiffs here would have to be

16   representative of the noteholders as a whole.  And we believe

17   that it would be a futile act to try to plead that somebody who

18   represents one, two or three percent of the noteholders because

19   they wouldn't be representing the interests of ninety-seven

20   percent of the noteholders as of today, could in fact plead

21   under 23.1 the requisite typicality in order to allow them to

22   replead.

23        But Your Honor, again, I don't believe that the

24   arguments that I'm going to make are going to require you to

25   reach anything having to do with the press release.

1      MR. SLOANE:  Your Honor, Peter Sloane, Cahill Cahill

2   Gordon for the defendants other than the Lehman Brothers

3   entities and other than Bank of New York.

4      I just wanted to add one thing.  For purposes -- I

5   agree with Mr. Slack entirely with respect to the necessity for

6   the Court to review that.  However, with respect to the

7   arguments that we are making in addition to the standing and

8   the jurisdiction arguments, we've made some arguments about

9   forum non conveniens and that issue of what is going on

10  elsewhere is highly relevant to that argument.

11     In fact, annexed to the Song (ph.) affidavit, as Your

12  Honor I'm sure has seen, are the initial offer made to the Hong

13  Kong residents plus an update as of a few weeks ago.  So it is

14  relevant if Your Honor feels that you should reach the issue of

15  forum non or abstention.  For our purposes it would be.

16     THE COURT:  Fine.  Thank you.

17     MR. SLACK:  May I proceed, Your Honor, to the motions?

18     THE COURT:  Please.

19     MR. SLACK:  Your Honor, the Wong action has been

20  brought by seven of, as I just said, about 25,000 noteholders

21  of an entity called Pacific Finance.  The notes are sometimes

22  called minibonds and you've seen that in some of the press

23  releases and papers.

24     As I'll discuss in a moment, Pacific Finance, in turn,

25  entered into a swap agreement with LBSF.  And the money from

1    both the noteholders and the LBS swap was put in a trust and a

2    trustee was appointed.  And that trustee, at the minibond

3    level, was HSBC.

4         I'm going to be addressing, Your Honor, the three

5    causes of action against LBSF.  The first cause of action was a

6    claim for a declaration that the estate has no interest in the

7    money at the minibond level or at the Saphire level.  As I will

8    get to that, Your Honor, is just not correct under the

9    governing documents.

10        The second cause of action, Your Honor, is really a

11   remedy rather than a separate cause of action, seeking a

12   preliminary injunction essentially for the same reason, on the

13   theory that LBSF doesn't have any interest in the funds.  They

14   want a preliminary injunction preventing the money from going

15   out to LBSF under any circumstances.

16        And third, the noteholders here asked for a

17   constructive trust.  So there are three causes of action but

18   they basically all ask and are based on the same idea that LBSF

19   is not entitled to any money, it's not an asset of the estate

20   as they put it, that's held as collateral right now by the

21   trustee.

22        We've moved to dismiss on two principle grounds, Your

23   Honor.  First is an issue that Your Honor's probably well aware

24   of because we've dealt with it both in the motion to stay and

25   in a separate motion to intervene.  And that is a standing

1   argument that these noteholders are creditors and are too

2   remote in order to bring the claims that they seek.

3        The second, Your Honor, is that under the governing

4   documents, in fact LBSF has a superior interest to the money

5   that's sitting in the trust at the minibond level.  And since

6   all money, as I'll explain in a second, flows through the

7   minibond level, LBSF has an interest in the money that flows

8   through.

9        Before turning to the merits, Your Honor, it's

10  important, I think, to understand the structure.  And again,

11  we've done this before and I'll try to do it quickly, but a

12  couple of preliminaries.  In paragraph 45 of their complaint

13  the plaintiffs allege that the transactions here are virtually

14  identical in that there were twenty-eight series of minibonds

15  that were issued and they say that they're virtually identical.

16  And the question is, why did they plead that?  And while I

17  don't like to try to get into the heads of my adversaries, I do

18  think the complaint answers that question to some degree.  And

19  that is that they are trying to bring this as a class action

20  and they have seven plaintiffs.  And they don't tell us which

21  of the minibond series their plaintiffs have bought into.

22  Instead, what they assert is that these seven, no matter which

23  minibond series they've bought into, can represent all of them.

24  And the reason for that is that they're virtually identical.

25       So Your Honor, having plead that they're virtually

1    identical and having a good reason for doing so under a class

2    action, we have taken that allegation as true and have based

3    our motion to dismiss on an example transaction, which is the

4    Series 10 transaction, as you might know from reading our

5    papers.

6          Your Honor, if you look at the structure chart here --

7          THE COURT:  Can I stop you for a second, before we get

8    to the chart?

9          MR. SLACK:  I'm sorry?

10         THE COURT:  Let me just stop you for one second --

11         MR. SLACK:  Yes.

12         THE COURT:  -- before we go to the chart.  I recognize

13    that there has been a pleading that the twenty-eight series of

14    minibond transactions are substantially identical and Series 10

15    is identified as a representative transaction.  As a matter of

16    fact, is this structure identical in each of the twenty-eight

17    series or are there differences?

18         MR. SLACK:  There are certain differences in the

19    documentation but the structure that is set forth in this chart

20    is going to be substantially similar in each of the

21    transactions.  In other words, both -- all of them have Pacific

22    Finance issuing notes.  All of them have Pacific Finance as the

23    swap counterparty.  All of them have Pacific Finance taking as

24    collateral the Saphire notes.

25         There are some differences in some of the terms of the

1   documents but the structure here of the transaction is, in fact

2   as I understand it, substantially similar.

3         THE COURT:  Okay.  And do all the transactions involve

4   the Saphire notes?

5         MR. SLACK:  Yes.  All of the transactions, again as

6   we'll get to it, the minibond level the collateral, as I

7   understand it, is for each of the Pacific Finance transaction

8   the Saphire notes.

9         THE COURT:  Okay.

10        MR. SLACK:  And if I'm wrong somebody -- one of the

11  people smarter in the courtroom will write me a note and I'll

12  tell you.

13        THE COURT:  Fine.  I'll be looking for that note.

14        MR. SLOANE:  I'll talk about the note, Judge.

15        MR. SLACK:  Your Honor, so the way this works, and I

16  actually went through a good part of what I was going to with

17  the transaction, is that Pacific Finance is an issuer and

18  issued notes to the minibond holders.  So the noteholders here,

19  the plaintiffs here, are creditors of Pacific Finance.  That is

20  their relationship with Pacific Finance.

21        In this transaction Pacific Finance entered into a

22  swap agreement with LBSF.  There is no privity.  There is no

23  contractual privity with the noteholders.  There's no

24  relationship between LBSF and the noteholders.  LBSF sole

25  relationship here is with Pacific Finance where it entered the

1    swap.

2           Now, what Pacific Finance did is they got the money

3    from the noteholders and they bought notes, which is the

4    collateral, for both the notes and the swap.  And that

5    collateral is held by the trustee which is HSBC.  And that is

6    essentially what we'll call the minibond level of the

7    transaction.

8           Now the reason there's two levels is that the notes

9    that they have for the minibond, that Pacific Finance bought

10   with the -- the collateral that Pacific Finance bought with the

11   money from the notes came from Saphire Finance PLC.  So the

12   relationship between Saphire Finance PLC and Pacific Finance is

13   as a creditor.  And Saphire had a relationship with LBSF and

14   with the money that they got from Pacific Finance they bought

15   notes issued by a different German company.  And those notes

16   are held by Bank of New York as the Trustee on the Saphire

17   level.

18          The important thing here is that the minibond

19   noteholders, on the Saphire level, are just simply creditors of

20   a creditor of the issuer of the notes and the counterparty

21   LBSF.

22          Your Honor, the standing issue with respect to the

23   noteholders I think is a very simple one and one that I think

24   we can deal with, at least in its basic form, very simply.  I'd

25   like to put up Section 1.4 of the Principal Trust Deed of

1    Series 10.

2          So again, there's a relationship between, as we looked

3    at, LBSF and the issuer Pacific Finance.  There's a trustee and

4    a trust deed for the collateral.  The plaintiff's plead that

5    the principal trust deed, the supplemental trust deed and the

6    prospectus are the governing documents.  And the principal

7    trust deed, at page 3, section 1.4, states, as you see on

8    there, "A person who is not a party to the principal trust deed

9    has no right under the contracts, Rights of Third Parties Act

10   1999, to enforce any term of this agreement except and to the

11   extent, if any, that this principal trust deed expressly

12   provides for such act to apply to any of its terms."

13         Your Honor, the principal trust deed was then

14   supplemented once for each series.  So even though what we're

15   going to be talking about is the tenth supplemental trust deed,

16   what that means is that this is the tenth series, each series

17   got one supplement.  So in the supplement that applies to the

18   series that we're talking about here though, you'll find this

19   in all of the series.

20         Section 6.2 at page 3 of the supplemental trust deed

21   has a very similar statement.  That "A person who is not a

22   party to the tenth supplemental trust deed has no right under

23   the contracts," again, "Rights of Third Parties Act 1999, to

24   enforce any term of this tenth supplemental trust deed."

25         Under the plain terms of both the principal trust deed

1    and the supplemental trust deed the noteholders or any third

2    party has no right to act with respect to the contracts that

3    we're talking about here.  The person who can act, Your Honor,

4    is the trustee under the trust agreement.  And there are many

5    provisions throughout the principal trust deed that allow the

6    trustee to take actions on behalf of noteholders and on behalf

7    of the collateral.

8         But what's important is that there is no provision in

9    the supplemental trust deed, none whatsoever, that allows the

10   plaintiffs to bring an action, the noteholders, the creditors,

11   to bring an action with respect to the contractual rights, the

12   governing documents, under the trust deed or the swap.

13        Now Your Honor, that should, in our view, end this.

14   That's as simple as the argument is on standing.  The -- you

15   have a creditor who's trying to assert the rights of

16   essentially its issuer.  And the documents themselves say that

17   these creditors have no rights under the documents.

18        Now there's a lot of discussion, Your Honor, in the

19   briefs, principally by the plaintiffs, saying that

20   notwithstanding these expressed provisions that they should be

21   allowed to maintain an action as a derivative action.

22   Essentially saying that where, in their view, the trustee

23   doesn't act appropriately that they can bring a derivative

24   claim.  And as a matter of U.K. law bring that derivative claim

25   on behalf of the trust instead of the trustee.

1        First point on that, Your Honor, is you don't have to

2   get there.  This complaint was not brought as a derivative

3   claim.  It was brought as a direct claim as a class action,

4   those are direct claims.  And there are very particular and

5   special procedural rules that a plaintiff must comply with in

6   order to bring a derivative action.  So even though we agree

7   that U.K. law would tell you when you can bring a derivative

8   action, Federal Rule of Civil Procedure 23.1 tells you what the

9   procedures are for bringing that action.  And none of those

10  procedures, which are not technicalities, have been met here.

11  Just for example, Your Honor, if you are bringing a derivative

12  claim the complaint must be verified.  That means that one of

13  the plaintiffs would have to issue a verification of the facts

14  in the complaint, all of the facts, and ultimately make himself

15  or herself available for deposition on that verification.

16       The complaint has certain -- there are certain

17  requirements that a complaint, certain elements, be pleaded

18  with particularity such as the reasons that they could not get

19  the trustee to act and what efforts they took to get the

20  action.  And the third point, and this may be the most

21  important given the conversations we've had today already, is

22  that the plaintiffs would have to show that they could fairly

23  and adequately represent the interests of the other

24  noteholders.

25       Your Honor, we believe this would ultimately be

1   extraordinarily challenging, given that ninety-seven percent of

2   the noteholders here are not similarly situated and have

3   accepted a settlement where they've given up their notes.

4          To the extent there's any question as to whether 23.1

5   applies here, I would tell the Court that 23.1 doesn't speak

6   directly in terms of trust but the case law has applied 23.1 to

7   trusts.  And in particular, Your Honor, the Eighth Circuit, as

8   an example, in the International Association of Firefighters

9   Local 2665 vs. The City of Clayton, held specifically that a

10  beneficiary to a trust could only "Bring this suit as a

11  derivative action that meets the requirements of Federal Rule

12  of Civil Procedure 23.1."  This ruling was echoed in a case by

13  the Southern District which is the Dallas Cowboys Football Club

14  vs. The National Football League Trust and that's at 1996

15  Westlaw, 601-705 from 1996.

16         The other point, Your Honor, that the plaintiffs have

17  made here is that somehow they should be allowed to replead

18  this as a derivative action because they've shown what are

19  called special circumstances.  And Your Honor, we, again, we

20  believe that that's going to be a futile act but I want to make

21  a point before I get there.

22         The claims that are brought today are brought in their

23  individual capacity.  And those claims can be dismissed and

24  should be dismissed with prejudice.  Whether or not the

25  plaintiffs bring a separate derivative action, which would then

1    have to comply with 23.1 and allow Your Honor to decide whether

2    there's typicality and they adequately represent and whether

3    there are special circumstances.  That is something that is

4    truly not before Your Honor today.

5         Your Honor could, and we think it would be

6    appropriate, to rule that it would be futile.  And why would it

7    be futile?  Because, Your Honor, the cases that they cite, that

8    the plaintiffs cite, to establish special circumstances, they

9    do not raise in their complaint and they do not arise to the

10   level of special circumstances.  They've raised two issues in

11   both their affidavits as well as their brief.  The first is is

12   that the trustee has supposedly failed to act in -- essentially

13   claiming the collateral at the minibond level for itself.  The

14   second is the trustee is supposedly conflicted, that HSBC is

15   somehow conflicted.

16        Going to the first one, Your Honor, the plaintiffs

17   cite no authority that seven of 25,000 beneficiaries because a

18   trustee isn't doing what they want them to do, those seven

19   beneficiaries can somehow bring a claim on behalf of the trust

20   and act instead of the trustee.  There's absolutely no

21   authority for that and the reason is that it would cause chaos

22   in the law.  You could have these seven bringing a claim here.

23   You could have another seven bringing a claim in Hong Kong.

24   You could have another seven bringing a claim somewhere else

25   against different parties.  And the case law supports that,

1      Your Honor.  The one case the plaintiffs attempt to cite for

2      the point is an 1886 case out of the U.K.  It's the Meldrum

3      (ph.) case.  It's cited by their expert.  And what that case

4      says is exactly contrary, actually, to the point that the

5      plaintiffs are making here.

6          The English court stated in that case that "It's quite

7      settled that a new refusal to sue on the part of a trustee does

8      not entitle a trust to sue in his own name."  And the quote

9      went on to say, "It would be monstrous to hold that whenever

10     there is a fund payable to trustees for the purpose of a

11     distribution amongst a great number of persons, every one of

12     those persons could file a separate bill in equity merely on

13     the allegation that the trustees would not sue."

14         And Your Honor, this is particularly problematic here.

15     Because the act that they're saying that the trustee shouldn't

16     take, and we're going to get here in just a moment, is that

17     they say the trustee should have tried to capture from LBSF the

18     collateral here.  And as you'll see, the documents in the

19     minibond level specifically give LBSF a superior right.  So

20     what the trustee has done here is, in our view, completely

21     appropriate in not seeking any kind of a lawsuit against LBSF

22     to capture that collateral.

23         With respect to the second special circumstance,

24     they've alleged that the trustee is somehow conflicted.  And

25     what they say, Your Honor, is that there's a theory that there

1     are certain affiliates of HSBC that have a claim against a

2     different debtor, that is LBHI in this case. But that is

3     completely hypothetical. There's absolutely no allegation in

4     the complaint that there is any actual conflict. That there's

5     been a conflict raised, that it's had an effect. They just

6     raise the fact that some affiliate has some interest in another

7     debtor in this case.

8          Before I get to the other part of the merits I want to

9     talk briefly about the standing at the Saphire letter.

10          Can I get the chart?

11          For obvious reasons, Your Honor, standing at the

12    Saphire level is even more remote than the standing we just

13    talked about at the minibond level. Because what essentially

14    they want to do is, in the minibond level they want to usurp

15    the authority of the trustee, HSBC. When you get to the

16    Saphire level you have a creditor of a creditor of an issuer.

17    But the authority they want to usurp here is really two-fold.

18    They have to usurp first the authority of HSBC which has the

19    ability to act on behalf of the collateral at this level, who

20    would then have to essentially be saying that they want to

21    usurp the authority of Bank of New York.

22          So you would have the minibond noteholders here not

23    only usurping the authority of one trustee but two trustees,

24    two separate trustees, and there has been absolutely no

25    allegation, whatsoever, that there is any issue with respect to

1    BNY.  So there's a flaw in both the concept here in the

2    pleadings, even if you were to get that far and say that a

3    creditor of a creditor of an issuer should have rights to bring

4    suit against LBSF.  And again, those rights would be at this

5    level, not even at this level.

6        A couple of points, Your Honor, that they make in

7    their brief with respect to this.  The plaintiffs here say that

8    you can disregard, essentially, everything that you see in the

9    trust documents and go directly to article 3.  And that article

10   3 is a panacea that allows them standing notwithstanding the

11   expressed terms of the trust documents.  That's wrong on two

12   counts.

13       First, Your Honor, the case law is very clear that a

14   creditor of a party is not permitted to assert the contractual

15   rights of that party.  Now we cite those in our brief.  I'm

16   going to butcher this case because it's got a really awful name

17   but it's G & R Moojestic Treats Inc. vs. Maggiamoo's

18   International.  And it's 2004 WL 1110423.  And that's just an

19   example of that point.

20       The second argument they make is that somehow bringing

21   a declaratory judgment instead of a claim for monetary damages

22   cleanses the standing issue from the documents.  And again,

23   there is no authority for that.  They cite U.K. law that they

24   saw allows them to bring a declaratory judgment action.  But

25   much like 23.1, whether a party can bring a declaratory

1    judgment action is a matter of procedure under U.S. law.  And

2    under U.S. law it's clear that they cannot bring a claim as a

3    creditor where the documents say that they can't.

4         So Your Honor, I want to -- I've got a couple more

5    points but the main point I want to talk about is now to deal

6    with each of the causes of action one at a time and I think

7    fairly quickly.

8         The plaintiffs here not only have an inferior right,

9    LBSF has a superior right to the collateral.  So if I could --

10        -- If you could put up, Rob, section 6.1.

11        Again, if you look at the principal trust deed, this

12   is the principal trust deed at section 6.1 at page 11, and this

13   is the provision that tells you that "The trustee shall,

14   subject to the provisions of each relevant supplemental trust

15   deed and the clauses 6.3 and 6.4 apply all monies received by

16   it, under the provisions of the principal trust deed and the

17   relevant supplemental trust deed and the relevant security

18   documents, if any, in connection with the realization or

19   enforcement of the security constituted thereby in accordance

20   with the priority specified in the relevant supplemental trust

21   deed and as such priority is set out in condition 4(b)."

22        And let me tell you what all that means.  There are

23   actually, in the trust deed, there are three types of

24   priorities that you can have in one of these trust deeds.  You

25   can have a priority that says derivatives counterparty

1　priority, that simply means that the derivative counterparty,

2　which is LBSF here, has priority over the noteholders.  There's

3　pari passu ranking priority, and that means that they share.

4　And then there's noteholder priority where the noteholders have

5　priority.

6　　　　So when you look at the supplemental trust deed and

7　you go to section 53(b) of the supplemental trust deed, and

8　that is at page 15 of that supplement, it says that the trustee

9　shall apply, and I won't read it, Your Honor, but it says the

10　trustee shall apply the monies, as you can see, in accordance

11　with derivative counterparty priority.  And so 53(b) chooses

12　the derivative counterparty priority as amongst the three types

13　of different priorities.

14　　　　And then if you go to section -- which is condition

15　4(b).  If you go to condition 4(b) which is at page 73 of the

16　principal trust deed, and in 4(b), just so you know, if you

17　chose another priority there's a different waterfall.  But in

18　the derivative counterparty priority it specifies that (b) the

19　money flows first to the derivative counterparty.  And then in

20　(c) it flows to the noteholders.

21　　　　And, Your Honor, the other documents that the

22　plaintiffs like to say is important is the prospectus, which is

23　attached as Exhibit C to the affidavit, and I may get this

24　wrong, Sing Heung (ph.).  And this is the prospectus that went

25　to each of the noteholders so it should be no surprise as to

1   what I just said.  And it says, "Under the trust deed the

2   claims of Lehman Brothers Special Financing, Inc. or Lehman

3   Brothers Finance S.A. as swap counterparty for any amounts due

4   to it under the swap arrangements, including any termination

5   payment as compensation for early termination, will be paid

6   first out of the proceeds of the collateral before the claims

7   of the noteholders are met."  So no surprise that this is the

8   way the documents work.  Everybody was told that right up front

9   and for the record that's page 18 of the prospectus.

10          So Your Honor, again, the noteholder -- the priority

11   here, and in terms of LBSF's interest in the collateral, is

12   expressed in the documents.  The only point I want to make, if

13   we could get back the structure chart --

14       (Pause)

15          MR. SLACK:  -- is that regardless of what the

16   documents say at this level, at the Saphire level, in order for

17   these noteholders to receive money, it must flow up through the

18   minibond level.  And so the way the documents read, the ones we

19   just looked at, the principal trust deed at the minibond level

20   indicates that for all money that flows up to these

21   noteholders, to these particular plaintiffs, that LBSF gets

22   their share first and in fact has priority over that

23   collateral.  It doesn't matter what the documents say here.

24   Let's say, for example, that LBSF doesn't have priority here,

25   then the money goes to the noteholders, which is Pacific

1    Finance in this case.  But the money that's at Pacific Finance,

2    again, is held by HSBC.  LBSF has priority at this level under

3    the documents that we just saw.

4         Your Honor, the last two claims I think, and I'm going

5    to be even briefer, are injunctive relief, which is cause two,

6    and the only point that I'll make in addition to the one that's

7    made in our papers, is that there is no irreparable harm here.

8    If, for whatever reason, money is distributed to LBSF and this

9    Court were ever to find that the money should not have gone to

10   LBSF, LBSF is sitting on a fairly substantial pot of money that

11   can be paid out if need be.

12        The third claim is a constructive trust and the only

13   point I want to make there, again we've briefed this, I think,

14   fairly extensively, is that where you have an actual trust,

15   which is what we have here, the law doesn't allow you to impose

16   a constructive trust over the same money.  And we've cited the

17   cases in our brief with respect to that.

18        So in conclusion, Your Honor, we think there's an easy

19   and ready path, under the plain terms of the documents.  The

20   plaintiffs here have chosen to bring their claims as direct

21   claims and under the plain governing document terms they can't

22   do that.  Similarly, they allege that LBSF doesn't have any

23   right to the collateral.  And again, the plain terms of the

24   documents support that.

25        So it's our view that the claims should be dismissed

1    with prejudice and that the Court doesn't need to address any

2    of the derivative pleading issues that have been raised by the

3    plaintiffs.

4            THE COURT:  All right.  Thank you.

5            MR. SLACK:  Thank you.

6            THE COURT:  Mr. Sloane is coming.

7            MR. SLOANE:  Afternoon, Your Honor.  Peter Sloane from

8    Cahill Gordon for all the defendants other than Lehman Brothers

9    and other than the Bank of New York.

10           Your Honor, first question I know the Court considers

11   in any of these proceedings is does it have jurisdiction over

12   this.  And the answer is, the Court does not have jurisdiction

13   over this because standing, Mr. Slack was talking about it

14   extensively, is jurisdiction.  And the Second Circuit has said

15   so in the Central States case which is 433 F.2d 181.  And the

16   quote, which I think is worth reading because jurisdiction is

17   very fundamental is, "An essential an unchanging part of the

18   case or controversy requirement of Article III.  If plaintiffs

19   lack Article III standing, a Court has no subject matter

20   jurisdiction to hear their claim because the standing issue

21   goes to the court subject matter jurisdiction.  It can be

22   raised sua sponte in the event it's been raised by both parties

23   regardless."  So the standing issue is a fundamental issue for

24   the Court to address.

25           The other point, Your Honor, in terms of the question

1  that was asked earlier about the news article, the Court is

2  entitled and the Court referenced this in the telephone

3  conference we had about looking to the four corners of the

4  pleading.  On a motion directed to standing or forum non, the

5  Court is permitted to look to matters outside the pleading.

6  It's footnote 9, page 9 of our brief, of our reply brief.

7         So a few preliminary points for the Court, let's face

8  what's really going on here, Judge, and Mr. Slack has alluded

9  to it.  And it is highly relevant to part of our arguments to

10  say it and to say it plainly.  The plaintiffs were looking for

11  a hook, a hook to get jurisdiction in the southern district in

12  a federal court.  And a hook was a class action that is not

13  available anywhere else, not available outside the U.S. nor

14  contingent fees available outside the U.S.

15         So what the plaintiffs have tried to do is to shoehorn

16  claims into this Court's bankruptcy jurisdiction recognizing,

17  we submit, that otherwise there would be no jurisdiction and

18  there would be no proper forum.  Now the reason I think it's

19  relevant, without suggesting I'm framing accusations at the

20  plaintiff's counsel, is because forum shopping is a fundamental

21  issue on a forum non analysis.  And if there is evidence of

22  forum shopping it speaks directly to the forum non question.

23         Judge Swain, in her decision, referenced the question

24  of the timing of all of the proceedings, the motion to withdraw

25  the reference, etcetera, and at least alluded to the fact that

it appeared there might have been some forum shopping there.

That, Your Honor, was totem pole forum shopping. The first

forum shopping was right here. And as I say, the case law

we've cited makes clear that it is relevant to the question of

the proper forum.

Now, I just want to point out a few other things, and

I know Your Honor's read the briefs very carefully so I'm not

going to try to state things that are obvious from the briefs.

But first of all, there is no defendant in this case that is

the trustee. The trustee is another entity called HSBC Bank

U.S.A. N.A. And we told the plaintiffs that before they say in

the briefs well we didn't present them with the proper

stipulation. Look, it's been a long time; they had plenty of

avenues to bring in the proper trustee. But the trustee is not

even a party to this case so that is point number one.

Point number two is this question that Mr. Slack

alluded to of the news article about what is going on in Hong

Kong. And as we allege and support in the Song affidavit,

Exhibits A and B and C, not only does the Hong Kong statutory

scheme or regulatory scheme make clear that anyone who agrees

to submit to that scheme gives up rights, but it also says they

give up their notes which is the point Mr. Slack made earlier.

In all of this it seemed to me one fundamental

question is, jurisdiction aside we want to turn to forum non

and the analysis there, why would this Court entertain the

1   special burdens and procedural complexities and the delays

2   associated with a class action, a class action of indirect

3   claims for relief.  I say that, HSBC says that but Your Honor

4   actually the plaintiffs' counsel themselves said it.  Because

5   in the motion to withdraw the reference, and is docket 56 in

6   this case, page 18 of their withdrawal brief, they say "While

7   Federal Rule of Bankruptcy 7023 incorporates Rule 23 of the

8   Federal Rules, consideration of a class action with members

9   numbering in the tens of thousands dramatically increases the

10  burden on the bankruptcy court already balancing the interest

11  of tens of thousands of other creditors."  That's the

12  plaintiff's -- that's what they said to Judge Swain and we

13  agree with that.

14          This Court shouldn't be burdened with a class action

15  and the legal framework by which this Court can dispose of this

16  case quite simply is both the standing argument at both levels,

17  and I want to come back to that in a second, jurisdiction

18  because both -- in the complaint they plead that the first

19  three counts were core but in the motion to withdraw they

20  called them related to.  In the complaint they plead that the

21  counts IV to XIII were related to and in their motion to

22  withdraw they called them, "Solely nonbankruptcy claims

23  involving issues of contract interpretation."  Your Honor, we

24  agree with that too.  That's all they are.  They're a fight

25  between nondebtors.

1       Now, I wanted to -- I said that I was going to refrain

2    from passing a note and just mention one thing about the

3    structure.  Mr. Slack is right; the basic structure is the

4    same.  The special purpose vehicle was not always Saphire.  It

5    was -- there were other entities, other names.  The basic

6    structure was the same and what differed, of course, and I say

7    of course but what differed was that there were -- the

8    waterfall provisions are slightly different in some of the

9    series then the others.  It doesn't change the basic analysis

10    at the minibond levels about standing or anything else but they

11    are slightly different.

12       And let me just add one other thing, because I know

13    the Court has struggled with arguments that have been made in

14    other cases on this question of the waterfall and some have

15    called it the flip clause, that has absolutely nothing to do

16    with this case.  There is no issue in this case of the flip

17    clause because the question is do they have standing to even

18    raise the issue.  So the Court need not deal with that issue

19    here.  It's not actually presented here and it's not relevant

20    or necessary to any of the arguments on standing.

21       The final point I want to make, Your Honor, and then

22    I'm going to sit down unless the Court has questions is this

23    question of forum non which, again, the Court could easily

24    reach looking at matters outside the pleadings.  But it doesn't

25    really have to because it's clear, by their complaint itself,

1    there's not a single plaintiff that is a resident here.

2         The prospectus says the minibonds are not registered

3    here.  The prospectus says the notes are not available to U.S.

4    persons.  We've argued the tenuous connection in the Gazzini

5    (ph.) case to jurisdiction over any of the HSBC entities.  And

6    what really sums it up is the Morrison case, Your Honor, where

7    the Court talked about the fact that we, here, Your Honor is an

8    American court not the world's court.  And the Court said we

9    cannot and should not expend our resources resolving cases that

10   do not affect Americans or involve fraud emanating from the

11   U.S.  And that's precisely the situation here and the fact that

12   ninety-nine point whatever percentage of the class has

13   participated in a settlement brokered by the Hong Kong

14   regulatory authorities underscores that dramatically, Your

15   Honor.

16        We've also argued extensively the jurisdiction, as a

17   personal jurisdiction issue.  I don't think the Court has to

18   reach that but I think it's clear that under Gazzini the

19   allegations here don't rise to the level of facts asserted in a

20   pleading that give rise to a prima facie showing of

21   jurisdiction.  And we've also briefed and argued the abstention

22   issue.  Again, I don't think necessary for the Court's

23   determination on this motion.

24        The Court can easily determine the sufficiency of the

25   complaint on the question of jurisdiction and that question is

1  the question of standing.

2       Thank you, Your Honor.

3       THE COURT:  All right.  Thank you.  I have a question

4  that's really for Mr. Slack and it's a question about the

5  impact of the, I'll call it, the repurchase of the minibonds

6  under the authority of the Hong Kong Monetary Authority

7  program, which apparently enables those institutions in Hong

8  Kong that sold the minibonds in the first instance to reacquire

9  them at, I gather, sixty percent of face in certain instances

10 and seventy percent for people who are sixty-five and older.

11      MR. SLACK:  That's correct, Your Honor.

12      THE COURT:  This may be well beyond the scope of this

13 argument but it occurs to me that in effect unless everything

14 is being unwound as a result of those purchases, the banks are

15 simply becoming the noteholders.

16      MR. SLACK:  That would be my understanding, Your

17 Honor.

18      THE COURT:  And if the banks are becoming the

19 noteholders, the banks presumably are in a position to now look

20 to HSBC Bank U.S.A. as trustee.  And demand or direct or do

21 whatever it is that noteholders do in respect of their trustee,

22 is that correct?

23      MR. SLACK:  That's exactly my understanding, Your

24 Honor.  In fact I think, and maybe Mr. Sloane can give some

25 color to this, my understanding of the way this works is that

1    as part of the settlement the banks, the issuing banks, are

2    providing the trustee with funding and indemnity in order to do

3    whatever it is that the trustee thinks is appropriate in order

4    to maximize the value of the collateral.

5            I may have said that slightly differently but --

6            MR. SLOANE:  May I respond on that, Your Honor?

7            THE COURT:  Mr. Sloane, why don't you respond on that

8    as well?

9            MR. SLOANE:  The banks that are actually subject to

10   the settlement are called the distributing banks; they're not

11   the selling banks.  The distributing banks, indeed subject to

12   the terms of all their indemnities and back and forth are going

13   to step into the shoes of the noteholders and may well decide,

14   they're all Hong Kong banks as I understand it, that whatever

15   resolution they seek, whether it's some kind of a lawsuit or

16   negotiated settlement, is something that they should do.

17   Indeed the scheme of the whole settlement contemplates that

18   they willing to and get some portion, that extra ten percent of

19   the proceeds from the trustee.

20           Now again, I'm not saying they have a right to it

21   absolutely.  I'm not saying we don't have defenses, these are

22   complicated transactions.  But that is, indeed, my

23   understanding of the way it would work.  So that is a matter

24   that awaits the outcome, whether subject to settlement or

25   subject to further litigation.  But it's not here.

1        THE COURT:  Right.  Okay.  Thank you.

2        MR. SLACK:  Your Honor, just to echo one thing that

3  Mr. Sloane said, because I requested a note and I did get a

4  note.  And what I was told is very similar to what Mr. Sloane

5  said that with respect to the Saphire level there were three

6  issues, so not just Saphire but there were two other issues.

7  But that -- and that there were different collateral that they

8  bought.  So in our chart here, for ten, they bought collateral

9  from a German bank.  But that essentially the structure is the

10  same where whether it's Saphire or one of the other issuers

11  would be in that spot and would buy collateral from a third

12  party, which was all the way at the bottom of the chart that we

13  had up here today.  But that essentially the structure of the

14  transactions that we put there is the same and on the minibond

15  level is absolutely the same, Your Honor.

16        THE COURT:  So Pacific Finance is the common element

17  in all structures?

18        MR. SLACK:  That's my understanding of the structures

19  in this series.

20        MR. SLOANE:  Yes, Your Honor.

21        THE COURT:  Okay.  Thank you.  Okay.  I'll hear from

22  counsel for the Wong plaintiffs.

23        MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis

24  on behalf of the Wong plaintiffs of the Coughlin Stoia firm.

25        I'm going to be addressing LBSF's arguments and the

way I'd like to proceed, if it pleases the Court, is first

address the two key standing arguments that LBSF makes.  And

then secondly address both the repurchase and the question

regarding the similarity of the documentation between series.

THE COURT:  Just so I'm clear on what's happening at

this point, are you limiting your presentation to the LBSF

arguments and will one of your colleagues be dealing with the

HSBC argument?

MR. DAVIS:  Yes.

THE COURT:  Or are you dealing with everybody's

arguments?

MR. DAVIS:  Yes, Your Honor.  My colleague, Luke

Brooks, also of the Coughlin Stoia firm, will be responding to

HSBC's arguments.

THE COURT:  Okay.

MR. DAVIS:  Thank you.  The plaintiffs in this case,

Judge, seek to represent a class of investors in collateralized

bonds called minibonds or notes.  They were issued by Pacific

International Finance.

The notes defaulted because of Lehman's September 15,

2008 bankruptcy.  Now the notes have been in default for over a

year but these notes were collateralized by assets set in its

trust that was supposed to be released under these exact

circumstances.  That collateral, the Saphire notes, still

hasn't been released.  It's still in limbo.

1      On November 25, 2008 LBSF sent a letter to the trustee

2  of the minibonds program, HSBC, and told HSBC to cease and

3  desist from taking any action to unwind the entire program.

4  The two reasons were the entire program; the entire 1.6 billion

5  dollar bond program was subject to the automatic stay.  The

6  second reason was an argument that the provisions, the priority

7  provisions, I believe in the Saphire bond the assets that's

8  sitting in trust supporting the noteholders, were unenforceable

9  as a matter of law.

10      Now that letter also included on the list the actual

11  Pacific International Finance notes.  So LBSF sent a letter to

12  HSBC stating that the entire program, subject to the automatic

13  stay, and both the Pacific International notes and the assets

14  held in trust by HSBC were effectively frozen.  Here we are

15  today, over a year later, and those assets still have not been

16  released.  And the reason we've come to the Court, Your Honor,

17  is to break the log jam.

18      These bonds have not been paid back.  While there is a

19  repurchase, they're still outstanding.  All of these questions

20  as to noteholder priority and to priorities in general are

21  still outstanding.  And I just want to make a point with

22  respect to the relationships that were up on the chart before.

23  Now LBSF concedes --

24      THE COURT:  Would it help you to have the chart?

25      MR. DAVIS:  It would.  I don't want to take his work

1    product.

2          MR. SLACK:  You're welcome, if it would be helpful, to

3    use the chart.

4          THE COURT:  Why don't we share the use of the debtor's

5    chart?

6          MR. DAVIS:  Now if you look -- so this chart is useful

7    to show the relationships in a predefault environment.

8          THE COURT:  Do you accept the chart, by the way, as a

9    fair depiction of the structure?

10         MR. DAVIS:  I'd say it's incomplete and I'll just

11   point out a couple of issues where I think it's incomplete.

12         So in a predefault environment I think it shows the

13   relationships reasonably well.  The problem, Judge, is we're

14   not in a predefault environment; we're in a postdefault

15   environment.  And you can see that box, HSBC U.S.A. as trustee.

16   Well, the trustee actually holds the Saphire notes in trust for

17   the benefit of the noteholders.  And so there aren't really two

18   levels in a postdefault environment, the levels collapse.  And

19   the question is, who's the rightful owner of the Saphire notes

20   and how much.

21         THE COURT:  I don't understand what you just said

22   about a collapse as a result of a default.  In what respect is

23   the structure different?

24         MR. DAVIS:  The structure -- the focus is different,

25   Judge, because after Pacific International Finance notes

1    default, then the investors look to the collateral.  The focus

2    isn't on Pacific International Finance because the notes are

3    limited recourse obligations.  And the documents specifically

4    say that the investors shall have recourse to the mortgaged

5    property.  And the way that the documents define mortgaged

6    property is reference to the Saphire notes that are sitting in

7    trust -- that are sitting in trust governed by HSBC for the

8    benefit of the noteholders under these exact circumstances when

9    the bonds default.

10    THE COURT:  Well I understand that argument but

11    counsel for LBSF says today, and frankly I heard this argument

12    some months ago in connection with your motion to intervene in

13    another adversary proceeding and in connection with request to

14    stay discovery and I don't know to what extent that hearing led

15    to the subsequent motion practice leading to attempts to

16    withdraw the reference, but that doesn't matter for today's

17    purposes.

18    What I did note, however, and I think I commented to

19    this effect to you during the course of the argument, was that

20    the holders of minibonds were remote relative to the dispute

21    that was then before me.  In what respect are they any closer

22    to the action now?

23    MR. DAVIS:  Yes, Your Honor.  They're directly related

24    to the action and I'll just cite a couple of lines from LBSF's

25    own papers.  They say that plaintiffs' claims are directed at

1    collateral underlying a trust to which they are beneficiaries.

2    As trust beneficiaries in a postdefault context, the assets

3    that were held in trust waiting, in the unlikely event that

4    LBSF went bankrupt, all of those rights have sprung up as a

5    consequence of LBSF's bankruptcy.

6         What's supposed to happen and what would have happened

7    if HSBC's declaration is to be believed, is the Saphire notes

8    would have been liquidated and distributed to the noteholders.

9    Now the reason -- so Judge, from plaintiffs' perspective the

10   only reason that the bonds haven't been redeemed consistent

11   with the terms of the trust is because LBSF sent a letter to

12   the trustee saying cease and desist, take no action, distribute

13   nothing, don't follow the terms of the trust.  And we're not

14   mere creditors of a creditor, that much is true Judge.  But in

15   a postdefault context the primary relationship that every

16   single bondholder of a recourse bond looks to are the assets

17   supporting the bond and their trust beneficiaries, their own

18   papers, acknowledge that.  And even their English law expert,

19   Judge, if I may they submitted an English law expert's opinion

20   on this whole subject.  And in paragraph 8 of his supplemental

21   opinion he says "The minibond investors are entitled to

22   security rights junior to those of LBSF at the retail or

23   Pacific Finance level."  So even their own English law expert

24   recognizes that plaintiffs have security rights and their

25   expert goes further when he analyzes security rights with

1    respect to LBSF.  What he says is under English law it's

2    property in the hand of the holder.

3         So in this case, Judge, the plaintiffs are trust

4    beneficiaries.  They hold a security interest in the Saphire

5    notes which were assets placed in trust by the debtor, Pacific

6    International Finance, to repay the minibonds under these exact

7    circumstances.

8         And Judge, we cite case law in the brief, under New

9    York law, that says under these circumstances plaintiffs who

10   are trust beneficiaries have standing to seek an adjudication

11   of the terms of the documentation and the rights and

12   responsibilities of the parties.

13        What do we have?  We have trust beneficiaries, a

14   trustee, HSBC, and a piece of property.  And the question is,

15   to whom does it belong?  Under New York case law, and we cite

16   Boyd and Kelley (ph.) in support of that concept, the law is

17   clear in this state that plaintiffs have standing to seek an

18   adjudication, to come to this Court and ask the Court to break

19   the log jam.  Under English law, which LBSF contends is

20   applicable in this instance, the outcome is exactly the same.

21        Now unfortunately the Court as dueling experts.  LBSF

22   submitted an expert opinion with their motion, plaintiffs

23   submitted a response and then their experts submitted an

24   additional declaration.  The experts come out on opposite sides

25   of the coin.  Professor McCormick, who provided his declaration

1   for LBSF, concluded that trust beneficiaries don't have

2   standing to seek a declaratory relief.  And under contracts

3   law, if they're not parties to the contract they don't have

4   standing.  Now Professor Odata (ph.) who provided an opinion

5   with plaintiffs' response said that's not true in declaratory

6   relief action.  All that matters is that a plaintiff have

7   interest that are vitally affected by the subject matter.

8         Now, how does the Court resolve these dueling experts?

9   I think there's a real world example that all us are very

10  familiar with and that's the Perpetual matter that's occurring

11  in London.  Now the Perpetual matter in London, Judge, was

12  brought by Perpetual who was a noteholder.  All Perpetual was

13  was a noteholder in that case and Perpetual sued the trustee

14  under the bond program.  Those bond documents are in the record

15  with LBSF's summary judgment motion.  Perpetual's name appears

16  nowhere in those documents, nowhere.  Perpetual is, for

17  procedural purposes, for the purposes of figuring out standing,

18  identically situated to the plaintiffs in this case, Judge,

19  with the following exception that LBSF will point out.

20        Now in that case Perpetual was seeking an adjudication

21  of just the trust terms of the documents governing the trust.

22  So the similar analogy would be, Judge, plaintiffs in this case

23  seek an adjudication of the documentation governing the trust

24  relationship between them as trust beneficiaries and HSBC as

25  the trustee.  The difference in this case, Judge, is we're also

1  seeking an adjudication as to the sole asset that's sitting in

2  trust.  And what is a trust, Judge, if it has three elements to

3  it, a beneficiary, a trustee and an asset.  And plaintiffs

4  submit that the Perpetual decision is a very clear indicator

5  that a noteholder, though not a party to the contract and

6  though just a fiduciary under the collateral trust, does indeed

7  have standing to sue in England.

8       THE COURT:  I don't mean to disagree with what you've

9  just said, and I'm not even sure that the Perpetual litigation

10  is a fair model for what we're dealing with today.  But my

11  understanding of the Perpetual litigation in London is that

12  Perpetual, a fund located in Australia that does not do

13  business, as far as I understand it, in the United States,

14  brought suit against BNY as corporate trustee in London as

15  beneficiary and brought a claim against its trustee.

16       In effect, it's what you might have done here if you

17  had the ability to do it against HSBC Bank U.S.A. as trustee,

18  and we'll deal with this with your colleague when he comes up

19  for the HSBC part of the argument.  But my understanding is

20  that the wrong parties were sued.  We can talk about that.

21       It's one thing for a trust beneficiary to have a claim

22  under the trust agreement that might be cognizable under the

23  trust instrument.  It's another thing for you to be where you

24  are up in the chain as creditors of Pacific Finance with an

25  indirect interest in an asset which is held in trust to be

1    pursuing that claim in a United States bankruptcy court with

2    your hook to jurisdiction being claims against LBSF as swap

3    counterparty and arguing that LBSF should not be asserting

4    rights with respect to the underlying asset.

5           That's what's going on here and I view that as

6    materially different in structure and purpose from what

7    happened in London, which is a very simple in the sense of the

8    parties' lineup, claim by a beneficiary against a trustee with

9    respect to the disposition of trust property.

10           MR. DAVIS:  If I may respond, Judge.

11           THE COURT:  Sure.

12           MR. DAVIS:  And if it pleases the Court, may I just

13    point something out on the demonstrative?

14           THE COURT:  Absolutely.

15           MR. DAVIS:  Okay.  So what -- the most important line

16    that is missing from this chart, Judge, is a line from HSBC

17    U.S.A. as trustee to the bondholders.  Now, LBSF admits in its

18    papers that this line should be here.  So right here the

19    analogy to the Perpetual matter, Judge, would be Bank of New

20    York as trustee of that bond program, Perpetual as the trust

21    beneficiary of that program.  And here HSBC as trustee under

22    the minibond program and plaintiffs as trust beneficiaries

23    under the minibond program.  That's the analogy, Judge.  And

24    the difference which LBSF will point out is the argument in

25    that case was focused on the trust documentation.  And while

1    that's a critical argument in this case, it's the argument that

2    LBSF says they have seniority in the waterfall structure and

3    therefore are entitled to everything. That's a critical

4    component of this case, Judge. But in addition to that the

5    question is the disposition of the sole asset that's held in

6    trust and that's the Saphire note.

7          Now the reason that we needed to name LBSF as a

8    defendant, Judge, is because in between that line, between HSBC

9    as trustee and the noteholders as trust beneficiaries in a

10    postdefault context, LBSF jumped in the middle of that

11    relationship where the trust assets should have been

12    liquidated. They should have been liquidated a year ago Judge,

13    and said hold up, this entire bond program and specifically the

14    letter that it sent, which is attached as an exhibit to our

15    document, was sent not to -- was sent to HSBC as trustee of

16    this minibond program. And so that's the similarity, Judge,

17    and that's the reason why, under English law, plaintiffs have

18    the right to seek an adjudication of the bond terms, of the

19    trust indenture to which they're trust beneficiaries, exactly

20    as Perpetual is.

21          THE COURT: Perpetual, however, as a foreign entity

22    sued as a trustee in a foreign court. Here we have foreign

23    individual holders of the minibonds suing through U.S. counsel

24    in a United States bankruptcy court. I don't think it's

25    exactly parallel at all.

1    If you had, in Hong Kong, sued the trustee because you

2  believe the trustee was not taking appropriate action and you

3  wanted to break the log jam there, more power to you.  What are

4  you doing here?

5    MR. DAVIS:  It's a fair question, Judge.  The reason

6  that we brought this suit here is because LBSF was the one who

7  has frozen the entire program.

8    Now it's a fair observation, Judge, the documents are

9  governed by English law, Perpetual is an Australian company,

10  most of my clients are Hong Kong individuals.  And to that

11  extent they're both foreign and the Hong Kong individuals could

12  have brought litigation in the United Kingdom, specifically in

13  London, under English law.  What would have happened?  They

14  would have tried to bring the entire case here and would have

15  accused plaintiffs of violating the automatic stay.  We wanted

16  to be conservative and bring the claims in the one court that

17  can decide these questions definitively and break the log jam.

18    Now suppose, Judge, we got a decision in Hong Kong

19  court in English court, what's the next step?  More

20  communication between judges as to which jurisdictional law

21  should apply?  Who should apply it?  It was clear, based on the

22  letter that LBSF sent to HSBC, that the reason that the entire

23  program was being locked up is because of the U.S. bankruptcy

24  law.

25    Now, I don't know if an English court can apply that

1    law or not.  I confess, I followed some of the filings in that

2    Perpetual case and I'm not sure exactly how that's going to

3    work out.  What I do know, for a cold, hard fact is that this

4    Court can apply bankruptcy law and adjudicate this question

5    definitively.

6            THE COURT:  All right.  Proceed with your argument.

7            MR. DAVIS:  The second principle argument that -- the

8    second basis for standing, Your Honor, is -- would be

9    derivative.

10           Now, we requested leave to amend under Rule 15 if the

11   Court found that plaintiffs didn't have the ability to bring

12   the suit directly.  So the question then would be, under

13   English law what are the circumstances in which a trust

14   beneficiary can step into the shoes of the trustee and litigate

15   a claim that purportedly belongs to the trust.

16           Now in that circumstance, Judge, the situation would

17   be absolutely identical to what's going on in London.  Because

18   Perpetual, like HSBC, holds -- Perpetual, like HSBC, is a

19   trustee for other investors.  And if we stepped into the shoes

20   of HSBC as trustee, we would be litigating almost the identical

21   issues with the one important exception and that is once it's

22   cleared up, whether the terms of the asset that's held in trust

23   are enforceable as a matter of English law and as a matter of

24   U.S. bankruptcy law, the question then becomes how is it

25   distributed.  And that's the next point I want to address, that

counsel for LSBF raised.

So the primary argument that LBSF makes as to how that asset is distributed really hinges a hundred percent on the payment priority provisions in the trust documents. And basically what they say is the allegations that plaintiffs make that they're entitled to a hundred percent of the Saphire notes, save customary and administrative fees, is not a valid claim because we're higher in the payment priority hierarchy. But judge, if they only have a one dollar interest in the trust, they don't have a superior interest when ninety-nine of the rest of the dollars, assuming par value of the note, goes to the plaintiffs. So the entire argument that they raise about payment priority is not valid. And what really needs to happen, after the presentation of evidence, is a determination of what, if any, termination payments they're owed.

Now the way that it works, and I can point the Court to the provisions in the supplemental trust deed that govern this question, is very similar to something the Court is already considering in the Ballyrack (ph.) matter. The question under how the termination payments are determined in the HSBC trust, to which plaintiffs are beneficiary, is really a question of can you find somebody else to replace LBSF? That's the question. And in all honesty, Judge, that's going to require an expert to get down to the last penny. But the fact of the matter is that LBSF doesn't get to choose -- the

1   fact of the matter is that LBSF does not get a hundred percent

2   of the distribution of the Saphire notes which, if they're

3   enforceable under U.S. bankruptcy law, are worth a hundred

4   cents on the dollar.

5         So the other -- the only other point I wanted to make

6   with respect to the argument that the payment priority

7   provisions are a hundred percent outcome determinative is you

8   really won't hear counsel say we're entitled to a hundred

9   percent of the assets.  That's simply not true.  And as alleged

10  in the complaint we believe plaintiffs are entitled to the

11  overwhelming majority, if not a hundred percent of that.  And

12  we think it's appropriate to allow that claim to go forward and

13  test it with discovery.

14        Look at the documents, what do the documents say?  If

15  expert reports need to be brought in, expert reports are

16  brought in.  But the bottom line, Judge, is that the right

17  result is reached and we're not standing around in limbo for

18  another year while these bonds are supposed to be paying

19  interest and are supposed to have returned a hundred percent of

20  their collateral but have not.

21        THE COURT:  Do you know if any of your individual

22  clients have accepted the offer being sponsored by the Hong

23  Kong Monetary Authority?

24        MR. DAVIS:  Yes, Judge.  I believe that three of our

25  clients either have or will accept a buyback.  And for the

record, we don't stand in the way of that buyback program.  But

four of our clients either cannot or will not, it's my

understanding, as of today.  And there's an important factual

clarification I just want to make on this repurchase program.

And that is 8,000 people aren't even eligible for it.  The

number that they're describing, this 25,000 individual number,

is the number of people who are eligible for it.  And I'm not

going to waste the Court's time explaining all the different

criteria for being eligible or not.  But suffice it to say

there are a lot of people who aren't hedge funds who are not in

the 25,000 person number.  There are thousands of other people

who would never fall in the definition of a quib (ph.) in the

United States, Judge.  And all of those people have received

zero.

     And the only other point that I wanted to make with

respect to this repurchase program, is that there's a provision

that allows any additional collateral that's recovered under

this program that's held in the HSBC trust, to which our

clients are beneficiaries, any incremental collateral that's

collected over that sixty to seventy percent passes directly

through to all of those people who participated in a program.

And that's an interest that those individuals still hold.

     For that reason, Judge, it's very important to decide

this question once and for all.  I understood the Court's

question with regard -- in this court.  I understood the

1    Court's questions with regard to the forum, whether it should

2    be in Hong Kong, whether it should be in London.  But at the

3    end of the day, Judge, this is the only court that can

4    definitely break this log jam.

5          THE COURT:  You keep calling it a log jam, and I

6    picked it up at one point, it's hardly a log jam when the Hong

7    Kong Monetary Authority is providing what's really an

8    extraordinary remedy for the holders of these minibonds to the

9    extent they qualify.  It's the farthest thing from a log jam.

10   In fact, it's a creative form of restitution.  What happens

11   after that, I don't know.  But why don't you stop calling it a

12   log jam, you have a litigation claim, period.

13         MR. DAVIS:  Yes, Your Honor.

14         THE COURT:  And as far as your pursuit of HSBC Bank

15   affiliates, I don't understand and I realize that you may not

16   be the right person to answer this; I don't understand why the

17   right party has not been named and what your purpose is in

18   pursuing litigation against affiliates that are not the

19   trustee.

20         MR. DAVIS:  Judge, my understanding is, on the Court's

21   first question the proper party the proper trustee being named,

22   my understanding, Judge is there was a breakdown in

23   negotiations.  HSBC wanted to extract some concessions that we

24   weren't able to give and all of the briefing on all of these

25   questions was already underway.

1          And I also understand that the general rule is if the

2     right party is on notice and knows that it's been named but for

3     an error in the complaint, that's sufficient under the rules.

4     Now counsel for HSBC, the firm here represents all of these

5     HSBC entities and it's true that there was a breakdown in the

6     negotiations over swapping out the right name for the trustee.

7          But what's also clear is that the right named party

8     knows that it's been named and has been making very detailed

9     arguments in its motion to dismiss, both on subject matter

10    jurisdiction grounds, forum non conveniens grounds and all of

11    the individuals who are affiliated with creating these bonds,

12    they're seeking to exclude them on personal jurisdiction

13    grounds.

14          THE COURT:  Look, I'm not presiding over negotiations

15    to name the right party.  I'm presiding over an argument in

16    connection with separate motions to dismiss.  But I've spent

17    some time reading papers having to do with arguments made by

18    HSBC parties that have no business being in this litigation and

19    I don't understand why the plaintiffs haven't simply dropped

20    them.  Why should I be hearing an argument in respect of an

21    HSBC entity that isn't the trustee and that has a perfectly

22    good basis for saying I want out and I shouldn't be paying

23    counsel fees to get out?

24          MR. DAVIS:  It's a fair question, Judge.  And if we

25    could rewind the clock and these negotiations had occurred

1    before all of these documents had been filed, maybe we would

2    have done things differently.  What we did say is look; we're

3    not standing on our papers and saying that we named the right

4    party.  We said we've made a mistake.  We sought leave to

5    amend.  And what's clear is that all of the substantive

6    arguments that would be made by the trustee are being made.

7    Why?  Because the trustee knows that it's been named.

8                And as to the other HSBC --

9                THE COURT:  But the argument that's being made by the

10   defendants here piece together as whole in this respect, they

11   think they've been wrongly sued.  And even if you had named the

12   right trustee, the right trustee would say what are you doing

13   here in a United States bankruptcy court.  That gets into the

14   forum non conveniens and abstention arguments that I'm not

15   really addressing right now, I wasn't asked to address right

16   now.

17               But there's something about this that seems vexatious

18   to me.

19               MR. DAVIS:  I misunderstood your first question,

20   Judge.  So the question is as to the other HSBC entities, why

21   are they here?

22               THE COURT:  Why are they still in the case at all?

23               MR. DAVIS:  Yes, Judge.  So Pacific International

24   Finance that issued securities that were tied to synthetic

25   collateralized debt obligations, that were tied first to

1   default credit swap baskets that were ultimately tied to

2   hundreds of derivative transactions, transactions that Warren

3   Buffett had called weapons of mass financial destruction, these

4   derivative transactions.  Pacific International Finance sold

5   these to retail investors.

6          Now Pacific International Finance is directed by HSBC

7   employees who are employees of HSBC Cayman.  And those two are

8   defendants, Judge.  And Pacific International Finance is a

9   defendant as well.  And the gravamen of the allegations against

10  this cluster of HSBC entities is number one; you can't sell

11  credit default swap linked assets to retail investors.  And

12  number two, you said that you would carefully select and

13  package this deal.  And it's very clear, from how things have

14  panned out, that that wasn't done.  Now that was the basis for

15  bringing them into this litigation.

16         Now it's fair that there are different issues with

17  respect to LBSF and these HSBC entities.  But because the facts

18  and circumstances appeared interrelated, Judge, it made sense

19  to bring them all in one forum.

20         THE COURT:  Maybe I misunderstood what your complaint

21  was about.  But I never understood that this was a complaint

22  that was about the inappropriateness of retail investors buying

23  into credit default swap linked securities sold offshore.  I

24  mean, is that what this case is about?

25         MR. DAVIS:  As we said in the complaint --

1          THE COURT:  I thought this case was about the Saphire

2     notes and the value of those notes and getting to collateral

3     and a trustee that wasn't acting and in your words a log jam.

4     It seems to me that you're coloring it with issues that really

5     aren't before me, aren't you?

6          MR. DAVIS:  Judge, one way to think about it is, from

7     our client's perspective, they just want to get what Pacific

8     Finance told them they'd get and that is their principle and

9     interest back.  And so in terms of sequencing the issues that

10    need to be litigated, it's very possible Your Honor that

11    plaintiffs could receive a hundred cents on the dollar just

12    after figuring out what's the value of the Saphire note and how

13    much of it should be passed through to investors.

14         But it's also true that these notes were

15    inappropriately sold to a lot of retail people.  And if it's

16    true, as LBSF seems to suggest, that the noteholders aren't

17    entitled to anything then we'd want to litigate that question

18    as well.  And so maybe the better way to think about it or one

19    way to think about it is maybe it makes sense to litigate the

20    questions just on the terms of the trust documents, what the

21    value of that asset is held in trust, how it should be

22    distributed first.  Because obviously if plaintiffs receive a

23    hundred percent of their investment back then there's no need

24    to litigate the other claims.

25         THE COURT:  Okay.  We're way off topic.  The topic is

1    why the motions, in your view, should not be granted.

2    Presumably there are reasons that have to do with standing.

3    And if there's more that you need to say about that, you

4    should.  If you're mostly done, I should hear from your

5    colleague.

6         MR. DAVIS:  Okay.  I would just summarize a few points

7    because LBSF counsel said that if plaintiffs -- that plaintiffs

8    -- it would be futile to allow plaintiffs to amend the

9    complaint to bring the case derivatively if it needed to be

10   brought derivatively.  And our position, Judge, is it doesn't.

11   And really the question boils down to whether there are special

12   circumstances in this case that would warrant bringing the case

13   derivatively.

14        And the points that I would make is HSBC does have a

15   234 million dollar conflict of interest.  It is its other --

16   there are -- that money owed by the bankruptcy estate to HSBC

17   affiliates is a substantial conflict and that's one thing that

18   courts consider.  The second point, Judge, is that LBSF, in

19   their papers, they say that not only are the noteholders trust

20   beneficiaries of this trust but they too are trust

21   beneficiaries of the same trust.

22        So going forward how is HSBC trustee to discharge its

23   fiduciary duties owed to two different groups of trust

24   beneficiaries who have exactly diametrically opposed economic

25   claims to the exact same limited fund.  It's impossible and

1     that's a special circumstance that a court could consider.

2          The other point that I want to make, Judge, is LBSF's

3     cease and desist letter really impacts a personal right that

4     the noteholders have.  In the postdefault context the asset's

5     supposed to be delivered to the investors to make them whole

6     for their investment.  That's how it was supposed to work.

7     That's not a right that belongs just to HSBC.  In a postdefault

8     environment that should be paid over to the investors.

9          Those are the primary points I just wanted to make.

10    If the Court wanted some clarification on the first question

11    regarding how documents were virtually identical and how that

12    plays into the arguments, I'm happy to entertain that question

13    as well.

14         THE COURT:  I don't think I need to hear more on that.

15         (Pause)

16         MR. BROOKS:  Good afternoon, Your Honor.  Luke Brooks

17    from the Coughlin Stoia firm.  And before I get started I'll

18    note that I have a pro hac application pending, I don't think

19    it's signed yet.  So with that --

20         THE COURT:  Consider it signed for today's purposes.

21         MR. BROOKS:  Thank you, Your Honor.

22         Your Honor, you touched on some of the issues in the

23    HSBC motion with Mr. Davis.  There really are two different

24    parts to this case.  HSBC addresses in its motion, essentially,

25    the second part of the case which are claims IV through XIII.

1    And those are claims for a breach of contract, breach of

2    fiduciary duty and other claims that we have related to both

3    predefault conduct and selling the notes and postdefault

4    failure to act in getting the collateral back.  And Judge,

5    they've moved so when we're talking about forum non conveniens,

6    really only those claims are at issue here.  Nobody has moved

7    to, for forum non conveniens for claims I through III.

8         Again, HSBC moved on subject matter jurisdiction on

9    those claims and Your Honor subject matter jurisdiction is

10   proper over those claims.  They arise from the same facts and

11   they're related to the bankruptcy.  And I know that we have an

12   issue regarding the named trustee in this case but I will note,

13   Judge, that the named trustee or the trustee HSBC Bank NA in

14   the bankruptcy filing filed a proof of claim.  And I don't know

15   if the Court is aware or is focused on that issue but in that

16   proof of claim they've sought indemnification from any damages

17   that we get against HSBC, they're seeking indemnification from

18   LBSF.  And so given that new fact that happened in September

19   after this was fully briefed, I don't think there's really any

20   question that there is subject matter jurisdiction under

21   related to for these claims IV through XIII.

22        THE COURT:  I think there is a question but I don't

23   know that we need to address it now.  The fact that HSBC, and I

24   don't know which HSB entity we're talking about, filed a proof

25   of claim before the bar date and included within that proof of

1    claim some kind of saving provision that included in the claim

2    some additional potential items that might be associated with

3    this litigation does not make this litigation related to that

4    proof of claim nor does it make it related to the bankruptcy

5    case.  All that it does is demonstrate that some lawyer, who

6    prepared the proof of claim, was thoughtful enough to think

7    well, couldn't hurt so I'll throw it in.  I assume that's how

8    it happened because it's not a direct claim; it's a contingent

9    claim in all respects.  And I have no idea whether or not there

10   is or is not any entitlement to indemnity with respect to that

11   claim and it's not before me at the moment.

12          Furthermore, as to the many thousands, if not tens of

13   thousands, of claims that have been filed in the Lehman case,

14   happily none of them are before me, yet.  That day will come,

15   no doubt.  That day is not today.

16          So I dispute, for purposes of this record, your

17   assertion that the fact that HSBC filed a proof of claim

18   somehow bootstraps you into related to jurisdiction for

19   purposes of this case.  I don't believe it does.

20          MR. BROOKS:  And Your Honor, I just want to make

21   clear, it's not that it bootstraps us in; I wanted to get this

22   fact out on the record and let the Court know and be aware of

23   it.  Again, from day one we have said that these claims are

24   interrelated.  The claims on IV through XIII are interrelated

25   with the claims on I through III.  And we assert, Judge, that

1    that gives us subject matter jurisdiction to be here in

2    bankruptcy court to pursue those claims.

3         THE COURT:  Okay.  Well, it's an intriguing argument.

4    Because generally speaking when there are claims between

5    nondebtors they try, with all their might, not to be in

6    bankruptcy court.  You seem to be doing the opposite, you're

7    suggesting that claims against nondebtors should be heard in

8    bankruptcy court notwithstanding the fact that the causes of

9    action all relate to events that took place in Hong Kong.

10        MR. BROOKS:  Well Your Honor, they don't correlate,

11   necessarily, to events that took place in Hong Kong.  Again,

12   there are postdefault claims regarding HSBC's failure to pursue

13   this collateral that relate to events that took place in New

14   York where LBSF, HSBC bank, the trustee, is a corporate citizen

15   and where the collateral is located.

16        And so, some of the claims relate to acts in Hong

17   Kong, marketing of the minibonds and the sale of the minibonds

18   and Pacific Finance and HSBC's general failure to protect the

19   interests of these retail investors.  Some of the claims arise

20   from events here.  But for -- I'm not sure if the Court is

21   addressing a subject matter jurisdiction or a forum non

22   conveniens question, in any event there's no -- if the Court is

23   interested in forum non conveniens --

24        THE COURT:  I think we should focus on the issues and

25   only the issues that relate to the motions to dismiss that are

1   before me.

2        MR. BROOKS:  Both of those are before you, Your Honor.

3   They've moved for dismissal based on subject matter

4   jurisdiction arguing that claims IV through XIII only are not

5   related to the bankruptcy and therefore we don't have a

6   jurisdictional hook.

7        The second argument they've made is forum non

8   conveniens.  If I understand the Court that the Court's

9   inclination is going to be to dismiss on subject matter

10  jurisdiction, I won't waste the Court's time discussing forum

11  non conveniens.  I will just remind the Court that those forum

12  non conveniens arguments only apply to claims IV through XIII.

13  They have nothing to do with I through III and the issues

14  regarding the declaratory relief, the constructive trust and

15  the resulting trust.

16       THE COURT:  All right.

17       MR. BROOKS:  Thank you.

18   (Pause)

19       THE COURT:  Any more?

20       MR. SLACK:  I promise to be brief, Your Honor, with a

21  couple of points.  The first point that I think counsel for the

22  plaintiffs made was that somehow there is a difference in the

23  documents predefault and postdefault.  And I went back, I had a

24  little time, and looked at the brief that was filed and

25  listened to the argument and there isn't a single provision of

1    the principle trust deed that's discussed that changes based on

2    whether you're in a predefault mode or postdefault mode.  And

3    in particular, Your Honor, the provisions that talk about

4    standing, section 1.4 of the principal trust deed and 6.2 of

5    the supplemental trust deed, do not change or alter in any way

6    whether you're in a predefault mode or a postdefault mode.

7         The second point, Your Honor, there was some

8    discussion that the noteholders are beneficiaries of the trust.

9    And that is not -- that is not disputed.  The provision though

10   that Professor McCormack cited, you know, that was cited by the

11   plaintiffs from Professor McCormack's declaration says that

12   they have a junior interest, the very provision that he read.

13        The second point, Your Honor, is just because you are

14   a beneficiary of the trust doesn't mean that the trust

15   documents allow you to sue third parties based on governing

16   documents.  In other words, they are bound by, as

17   beneficiaries, the documents under the trust.  And Your Honor,

18   I mentioned, for example, a case under U.S. law that dealt with

19   23.1 and it was the Eighth Circuit case that I mentioned.  And

20   in that case you had beneficiaries of a trust.  The fact that

21   you are a beneficiary of the trust doesn't give you rights that

22   are outside the trust documents.  In fact, many trust documents

23   have restrictions.  These trust documents have specific

24   provisions that deal with who can sue on the governing

25   documents.

1      Lastly, Your Honor, on the Perpetual matter.

2  Perpetual sued the trustee, which I think is very different and

3  I don't know the claims that were brought specifically but

4  Perpetual was also a hundred percent noteholder.  Whatever

5  their theory was, presumably a hundred percent noteholder can

6  either direct the trustee or have a direction under the

7  documents and I haven't studied the Perpetual documents.  But

8  the fact that you have a hundred percent of the notes is a very

9  different situation.  And you have certain abilities to direct

10  under most no action clauses and the like and most trust

11  documents that you don't have if you're merely seven out of

12  30,000.

13      So Your Honor, the last point I guess I would point

14  out is that whether you're in predefault or postdefault the

15  documents work the same way, which is that if you have a claim

16  Pacific would make a claim against LBSF on that chart, right,

17  you owe us money.  Pacific would pay the trustee, right, which

18  pays the swap counterparty.  The trustee, actually, is the one

19  that makes the payment.  And then, if anything is left from the

20  payment to LBSF from the trustee, then it goes to the minibond

21  holders.  And that is the same whether you're in predefault

22  mode or post -- I mean, that is just the way the documents

23  work.  There is no change in the documents based on, at the

24  minibond level, based on a default.

25      So with that, Your Honor, unless you have any

1    questions, I don't have anything further.

2         THE COURT:  Mr. Sloane?

3         MR. SLOANE:  Very quickly, Your Honor, just a couple

4    of points.  Perpetual -- Your Honor's right.  Perpetual has

5    nothing to do with this case.  It's not this case.  It has

6    nothing to do with the issues here.  The waterfall, at least

7    insofar as the plaintiffs characterize it, really is not an

8    issue here as it is in Perpetual, as it is in some of the other

9    cases.

10        Mr. Davis said, why are we here and not the U.K.?  We

11   all know why we're here.  We're here because the plaintiffs

12   were looking for a place that accepts class actions and accepts

13   contingent fees.  And I say that because, as I said earlier, it

14   is relevant to the question of gamesmanship.  And gamesmanship

15   is exactly what the forum non analysis looks to prevent.

16        Finally, Your Honor, I just wanted to point out that

17   some smart lawyer did indeed make the filing of the proof of

18   claim a contingent claim that includes a contingent claim in

19   respect of this proceeding.  Your Honor's absolutely right,

20   that has absolutely nothing to do with this adversary

21   proceeding, which they seek to prosecute.  Indeed, if anything,

22   it argues against the plaintiffs' position because their

23   position is the trustee was asleep.  Well, the trustee has

24   pursued the remedies and the proper party that did file it was

25   the proper HSBC Bank U.S.A. National Association not the

1    defendant in this case.

2         Thank you, Your Honor.

3         THE COURT:  Okay.  I'm going to take a ten minute

4    break and think about whether or not I want to say anything

5    now.  And I'll come back in about ten minutes and I will say

6    something, I'm not sure what it's going to be other than have a

7    nice afternoon and I'll see you in ten.  We're adjourned till

8    then.

9         (Recess from 3:58 p.m. until 4:12 p.m.)

10        THE COURT:  Be seated, please.  I was looking at my

11   calendar, what I think makes sense to do here is to add this to

12   the adversary proceeding portion of the November 18th omnibus

13   hearing agenda for purposes of a status conference, recognizing

14   that I will either provide a bench ruling at that time or give

15   you some indication as to where I am in the process of deciding

16   this.  And would suggest that you don't need three lawyers on

17   one side, but I would suggest that those who feel that it's

18   appropriate to be present show up and I'll tell you what I

19   think at that time.

20        We're adjourned till then.

21        (Proceedings concluded at 4:13 p.m.)

22

23

24

25

C E R T I F I C A T I O N

I, Pnina Eilberg, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Pnina Eilberg

AAERT Certified Electronic Transcriber (CET**D-488)

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501

Date: